Avia Turner-Gray
3538 Cumberland Road
East Point, Georgia 30344
(404) 444-6561
aviaturnergrayattyatlaw@gmail.com
Plaintiff In Pro Per

FILED
OCT 26 2026
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

ORIGINAL

BY FAX

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| AVIA TURNER-GRAY,<br><br>Plaintiff,<br><br>v.<br><br>AVIS BUDGET GROUP, INC.;<br>AVIS BUDGET CAR RENTAL, LLC;<br>PV HOLDING CORP.;<br>ARMANDO CRUZ;<br>GARY RUSSELL;<br>DOUGLAS REID;<br>KEVIN DECORTE;<br>SHAMOND BROOKS<br>AUTUMN POTI;;<br>AIRENE LAYLO;<br>RODEL CATAM;<br>MAHALIA PARKER; and<br>DOES 1 through 50, inclusive,<br><br>Defendants. | CV26 12557 LJC<br>**Case No.** __________<br><br>**COMPLAINT FOR:**<br>1. Civil RICO, Conduct of an Enterprise Through a Pattern of Racketeering Activity, 18 U.S.C. § 1962(c)<br>2. Civil RICO Conspiracy, 18 U.S.C. § 1962(d)<br>3. Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS


Introduction

Related Action

Parties

Jurisdiction and Venue

Statement of Facts

- A. Plaintiff's Career and the Corporate Account
- B. Defendants' Knowledge of Bad Paper, 2009 to 2022
- C. The Rental Exchange of June 26, 2022
- D. The Four Months Before the Report
- E. The Theft Report of October 25, 2022
- F. The Arrest of October 26, 2022
- G. Santa Rita Jail
- H. Release, Dismissal, and the Findings of Factual Innocence
- I. The Record That Did Not Clear and the Loss of Plaintiff's Practice
- J. Other Lawful Renters, 2014 to 2025
- K. Defendants' Public Statements and Their Own Records

RICO Allegations

- A. The Enterprise
- B. The Scheme to Defraud
- C. The Predicate Acts
- D. Relatedness and Continuity
- E. Injury to Business and Property

Statement of Claims

- First Claim: Civil RICO, 18 U.S.C. § 1962(c)
- Second Claim: Civil RICO Conspiracy, 18 U.S.C. § 1962(d)
- Third Claim: Unfair Competition Law, Cal. Bus. & Prof. Code § 17200

Damages

Prayer for Relief

Demand for Jury Trial

Plaintiff Avia Turner-Gray alleges as follows, on personal knowledge as to herself and on information and belief as to all other matters.

## INTRODUCTION

1. On October 26, 2022, police officers surrounded Plaintiff at gunpoint in a parking lot in Dublin, California, handcuffed her, and took her to Santa Rita Jail, where she was booked on a felony vehicle theft charge, confined overnight in a cell contaminated with human feces, and assaulted by another detainee. She was released the next afternoon. The District Attorney declined to file any charge. Two successive Chiefs of Police for the City of Dublin later certified under Penal Code section 851.8 that no reasonable cause had ever existed to believe she committed any offense.

2. Plaintiff was driving a vehicle that Defendants rented to her, under a corporate account Defendants had maintained since 2007, through an exchange Defendants' own employees processed and Defendants' own gate agent cleared. The vehicle was never stolen. Defendants reported it stolen anyway, on a sworn form signed by their own manager certifying that it was rented to no one and its driver was unknown, while Defendants held Plaintiff's name, telephone number, GPS data showing where the vehicle was, and internal messages describing her as a good customer.

3. Defendants call the condition that produced this bad paper: rental documentation their own employees generate and their own system does not recognize. Defendants have known of it by name since at least 2009, have prohibited the practices that cause it since at least 2012, and have never fixed it. Instead they operate a loss prevention function that converts bad paper into theft reports to police without verification, uses law enforcement

as an unpaid vehicle recovery service, and collects money from customers under threat of prosecution. That function is a racketeering enterprise, it has operated for more than a decade across the United States, and it produced Plaintiff's arrest.

4. Plaintiff is a registered nurse with approximately thirty years in trauma and critical care who built a practice as an interim nurse executive contracting with hospitals through staffing agencies. That practice requires a clean criminal background check for every engagement. Defendants' acts placed a felony theft arrest in her record, and four years and two findings of factual innocence later it is still there. Plaintiff brings this action under the Racketeer Influenced and Corrupt Organizations Act to recover, trebled, the injury to her business and property, and under California's Unfair Competition Law to enjoin the practice.

## RELATED ACTION

5. On October 25, 2023, Plaintiff filed Turner-Gray v. Avis Budget Car Rental, LLC, No. 3:23-cv-05507, in this District, asserting California tort claims against Avis Budget Car Rental, LLC arising from the same arrest. That action is pending.

6. That action originally named Avis Budget Group, Inc. and PV Holding Corp. Plaintiff dismissed them in reliance on the representation of Defendants' then counsel that they were not proper parties. Documents Defendants later produced establish that the representation was false.

## PARTIES

7. Plaintiff Avia Turner-Gray is an individual residing in Fulton County, Georgia.

8. At all relevant times Plaintiff was a registered nurse licensed in California and other states.

9. At all relevant times Plaintiff worked as a travel nurse and interim nurse executive, obtaining engagements with hospitals and health systems through staffing agencies on a contract basis.

10. Defendant Avis Budget Group, Inc. is a Delaware corporation with its principal place of business at 6 Sylvan Way, Parsippany, New Jersey.

11. Avis Budget Group, Inc. is the ultimate parent of the Avis, Budget, Payless, and Zipcar rental brands in the United States.

12. Avis Budget Group, Inc. promulgates the work rules, human resources policies, and incentive compensation plans that govern the employees of its operating subsidiaries, including the employees at San Francisco International Airport.

13. Avis Budget Group, Inc. maintains a loss prevention and corporate security function at 300 Centre Pointe Drive, Virginia Beach, Virginia, that directs the reporting of vehicles as stolen across its brands.

14. Defendant Avis Budget Car Rental, LLC is a Delaware limited liability company and a wholly owned subsidiary of Avis Budget Group, Inc.

15. Avis Budget Car Rental, LLC holds the concession for rental operations at San Francisco International Airport and employed Defendants Cruz, Russell, Reid, DeCorte, Brooks, Laylo, and Catam at the relevant times.

16. Defendant PV Holding Corp. is a Delaware corporation and a subsidiary of Avis Budget Group, Inc.

17. PV Holding Corp. is the registered owner of the 2022 Nissan Altima, California license plate 8ZXZ692, MVA 98978342, that Defendants rented to Plaintiff and then reported stolen.

18. Defendant Armando Cruz is an individual who at all relevant times was employed by Defendants as Operations Manager, also described as Production Manager, at the San Francisco International Airport rental location.

19. Cruz's incentive compensation was administered under Avis Budget Group, Inc.'s Short-Term Incentive Plan, in which his process level is designated as Avis Budget Group.

20. Defendant Gary Russell is an individual who at all relevant times was employed by Defendants as Northwest Regional Security Manager, a position within Defendants' loss prevention and corporate security function.

21. Defendant Airene Laylo is an individual who at all relevant times was employed by Defendants at the San Francisco International Airport location, first as a corporate lease agent and later as Station Manager.

22. Defendant Douglas Reid is an individual who at all relevant times was employed by Defendants as the supervisor of Defendant Russell within Defendants' loss prevention and corporate security function, as Defendants' Rule 30(b)(6) designee testified in the related action. Reid was a recipient of the August 21, 2022 FileNet record concerning Plaintiff's vehicle.

23. Defendant Kevin DeCorte is an individual who at all relevant times was employed by Defendants as District Manager with authority over the San Francisco International Airport location. DeCorte participated in the October 2022 electronic mail chain in which the reporting of Plaintiff's vehicle as stolen was directed.

24. Defendant Shamond Brooks is an individual who at all relevant times was employed by Defendants as Airport Manager at the San Francisco International Airport location. Brooks participated in the same October 2022 electronic mail chain.

25. Defendant Rodel Catam is an individual who at all relevant times was employed by Defendants as a rental return agent at the San Francisco International Airport location. Catam processed the return that terminated Plaintiff's mini-lease transaction on June 26, 2022.

26. Defendant Mahalia Parker is an individual who at all relevant times was employed by Defendants in the loss prevention department at 300 Centre Pointe Drive, Virginia Beach, Virginia.

27. Parker was one of the twelve recipients of the August 21, 2022 FileNet record concerning Plaintiff's vehicle, completed the Vehicle Recovery Checklist for the vehicle, contacted the National Insurance Crime Bureau concerning it, and signed the November 1, 2022 letter to the San Mateo County Sheriff concerning it.

28. Defendants Does 1 through 12 are the remaining recipients of the August 21, 2022 FileNet record concerning Plaintiff's vehicle, identified by name on the document Defendants produced in the related action as AVIA001809, including Aimee Dean, Amber Manuel, Jessica Bajorek, Danny Pearson, Antionette Towner, Alisa Tucker, Carlene Johnson, Jeff Myers, and Keith Vecci, whose positions Defendants have not disclosed, together with the person identified as "Pat Bouge" on the Vehicle Recovery Checklist at AVIA001729 and the loss prevention team leader or supervisor whose signature appears in the approval block of that checklist. Defendants have declined to

identify their positions in the related action. Plaintiff will amend to state their true names and positions when Defendants disclose them.

29. Defendants Does 13 through 50 are individuals and entities whose identities are not presently known to Plaintiff and who participated in the conduct of the enterprise alleged below, including other loss prevention and corporate security personnel of Avis Budget Group, Inc. at Virginia Beach who directed, approved, or transmitted the theft reports and demand letters that constitute the pattern; executives of Avis Budget Group, Inc. who promulgated, maintained, or ratified the policies and practices alleged. Plaintiff will amend to state their true names when ascertained.

30. At all relevant times each Defendant was the agent, employee, or co-conspirator of each other Defendant and acted within the scope of that relationship.

31. Avis Budget Group, Inc.'s Work Rules state that they bind Avis Budget Group and all its subsidiaries collectively.

## JURISDICTION AND VENUE

32. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because the First and Second Claims arise under 18 U.S.C. § 1962.

33. This Court has supplemental jurisdiction over the Third Claim under 28 U.S.C. § 1367(a) because it arises from the same nucleus of operative facts.

34. This Court has personal jurisdiction over each Defendant. The entity Defendants conduct continuous and systematic business in California and committed the acts alleged here in California. The individual Defendants reside in or are employed in California, or directed

the acts alleged here at a vehicle and a renter in California. 18 U.S.C. § 1965(b) further authorizes nationwide service in RICO actions where the ends of justice require.

35. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, and under 18 U.S.C. § 1965(a) because Defendants reside, are found, have agents, or transact their affairs here.

## STATEMENT OF FACTS

### A. Plaintiff's Career and the Corporate Account

36. Plaintiff has practiced as a registered nurse for approximately thirty years, principally in trauma and critical care.

37. For most of that career Plaintiff has worked as a travel nurse and interim nurse manager, obtaining contract engagements with hospitals and health systems through intermediary staffing agencies.

38. Interim nurse executive engagements are contract-based, short-notice, and higher-paying than permanent positions, and are awarded through staffing agencies that submit candidates to hospital clients.

39. Every such engagement requires the candidate to pass a criminal background check. A candidate who completes ten engagements in a year is background checked ten times.

40. A felony arrest in a candidate's record places that candidate at the bottom of consideration against competing candidates who have none, because hospital clients engaging interim personnel on short notice do not take on candidates with unresolved criminal background entries.

41. In December 2020, B.E. Smith Interim Solutions, LLC, now AMN Healthcare Interim Solutions, LLC, recruited Plaintiff to serve as an interim nurse manager at a Kaiser Permanente hospital in the San Francisco Bay Area. Plaintiff's engagement began in January 2021.

42. As part of her compensation, Plaintiff received a rental vehicle paid for by the staffing agency for the duration of the engagement. Plaintiff did not select the rental company and received no bills for the rental.

43. The staffing agency's rental vehicle provider was Defendants.

44. On January 15, 2007, Defendants opened a corporate mini-lease account for B.E. Smith, Inc., AWD No. G0079000.

45. Defendant Laylo originated that account. Her name appears as the originating agent on eleven pre-printed thirty-day contracts issued under it.

46. Defendants' Wizard system designated the account with the prefix ML, denoting a mini-lease.

47. The account remained continuously active from January 15, 2007 through at least October 2022.

48. Plaintiff first picked up a vehicle under the account from Defendants' San Francisco International Airport location on or about January 11, 2021.

49. Defendants directed Plaintiff to exchange her vehicle periodically, as often as every thirty days.

50. Plaintiff exchanged vehicles under the account repeatedly between January 2021 and June 2022 without incident.

**B. Defendants' Knowledge of Bad Paper, 2009 to 2022**

51. Defendants' incentive compensation structures reward rental agents and managers for transaction volume and for particular transaction types.

52. Those structures create an incentive for employees to terminate existing corporate and mini-lease contracts and reissue them as new transactions, to apply manual rates, and to process exchanges as new rentals, in order to generate commission credit.

53. When an employee does so, the customer receives rental documentation that Defendants' Wizard system does not recognize as a valid rental.

54. Defendants' own employees refer to that condition as bad paper.

55. In 2009, the Vice President of Human Resources at Avis Budget Group headquarters issued a memorandum documenting the employee practices that generate the condition. The memorandum states that it covers employees of the parent and its subsidiaries. It was produced in the related action at AVIA002409 through AVIA002411.

56. In 2012, Avis Budget Group issued Rules of the Road prohibiting those practices by name, including: do not use a manual rate on a mini-lease; do not close out and reopen car exchanges as walk-ups; and do not use the former mini-lease agent identification numbers.

57. Defendant Cruz signed the 2012 Rules of the Road on October 8, 2012.

58. In 2018 and 2019, an internal Avis investigation arising from the conduct of a former employee at four locations in the Monroeville, Pennsylvania area identified fifteen fraudulently rented vehicles that had been reported stolen and ninety-two fraudulent rental contracts, and estimated that approximately thirty additional vehicles could be reported stolen in the following weeks. The investigation is reflected in court records in that matter.

59. On or about August 3, 2020, Walt Zalisko, who had served approximately five years as a director of security for Avis Budget Group, stated in a broadcast investigation that he had personally observed multiple instances of Avis and Budget vehicles released to customers while still flagged as stolen in Defendants' system.

60. Zalisko also stated to the Philadelphia Inquirer that Avis Budget sometimes filed improper police reports because of communications breakdowns among employees.

61. Beginning no later than 2021, the national press reported extensively that Hertz Global Holdings, Inc. had caused the arrest of hundreds of its own customers through erroneous theft reports arising from unrecorded extensions, unrecorded returns, and failure to clear reports after recovery.

**C. The Rental Exchange of June 26, 2022**

62. In June 2022, a catalytic converter was stolen from the Toyota Camry Plaintiff was then driving under the account, at her residence.

63. On June 26, 2022, Plaintiff drove to Defendants' rental facility at San Francisco International Airport, 780 North McDonnell Road, to exchange the Camry for a different vehicle under the account.

64. The facility was busy and Plaintiff waited an extended period to reach a counter agent.

65. At 20:49, Defendant Rodel Catam, a rental return agent employed by Defendants, processed the return of the Camry in Defendants' system without informing Plaintiff that he had done so, and directed Plaintiff to go upstairs and report the mileage and fuel level to a rental counter agent.

66. A rental counter agent employed by Defendants, whose identity Defendants have stated under oath they cannot provide, then processed Plaintiff's exchange.

67. That agent terminated the existing mini-lease transaction in Defendants' Wizard system.

68. That agent did not initiate a replacement contract under the corporate account.

69. That agent issued to Plaintiff a printed rental agreement bearing number 756086236 and reservation number 15766940-US-0, describing a Chevrolet Malibu.

70. Rental agreement number 756086236 corresponded to no transaction in Defendants' system.

71. The vehicle first assigned to Plaintiff was unacceptable. Plaintiff asked an employee to summon a manager.

72. Approximately twenty minutes later, a manager employed by Defendants met Plaintiff, walked with her through the lot, and selected a black 2022 Nissan Altima, California license plate 8ZXZ692, MVA 98978342.

73. The manager told Plaintiff she could take the Altima and proceed to the exit gate.

74. Plaintiff presented her driver's license and the rental agreement to Defendants' gate agent at the security exit.

75. The gate agent inspected the documents and the vehicle and cleared Plaintiff through the exit at 21:53.

76. Defendants' system recorded no rental of the Altima to Plaintiff, to the corporate account, or to anyone.

77. Plaintiff did not know that the rental agreement she held corresponded to nothing in Defendants' system.

78. The termination of the mini-lease transaction and the generation of rental agreement 756086236 were transmitted through Defendants' Wizard system, a nationwide mainframe maintained outside California, by wire in interstate commerce.

**D. The Four Months Before the Report**

79. Plaintiff drove the Altima from June 26, 2022 through October 26, 2022 in the ordinary course of her engagement.

80. During that period Defendants possessed GPS telematics data showing the Altima's locations.

81. During that period Defendants possessed Plaintiff's name, telephone number, electronic mail address, physical address, and the payment card associated with the account.

82. During that period Defendants' personnel left voicemail messages for the last renter of the Altima at a specific telephone number.

83. During that period Defendants' personnel exchanged internal communications acknowledging that the person likely in possession of the Altima was a good customer.

84. Defendants did not contact Plaintiff by telephone, electronic mail, mail, or demand letter.

85. Defendants did not reconcile the corporate account against the Altima.

86. On or about August 2, 2022, Defendant Laylo, in response to inquiry from Defendants' investigators concerning the account under which the Altima had been released, stated that the account was not a mini-lease.

87. That statement was false. Defendants' Wizard records designated the account with the ML prefix, and Laylo had originated it as a mini-lease.

88. On or about August 21, 2022, Defendants' employees transmitted an internal electronic mail message stating, in capital letters, that Defendants had had a few issues with cars on bad paper in the past. The message is quoted in Plaintiff's publicly filed motion in the related action at Dkt. No. 99-1, page 9.

89. On or about October 11, 2022, Defendant Russell transmitted an electronic mail message referring to prior incidents and stating that he did not want another good customer pulled out on bad paper.

**E. The Theft Report of October 25, 2022**

90. On or about October 25, 2022, Defendant Russell transmitted to Defendant Cruz, in an electronic mail chain in which Defendants DeCorte and Brooks participated and Doe Defendants were copied, the instruction that time had expired and to report the Altima that day. No participant in that chain directed that Plaintiff be contacted, that the account be checked, or that the telematics be consulted.

91. On October 25, 2022, Defendant Cruz executed California Highway Patrol Form 180, a stolen vehicle report, under penalty of perjury, on behalf of Defendant PV Holding Corp. as registered owner.

92. The CHP 180 certified that the Nissan Altima was not rented to anyone at that time.

93. That certification was false. The Altima was rented to Plaintiff under the account.

94. The CHP 180 certified that the last driver of the Altima was unknown.

95. That certification was false. The last driver was Plaintiff, whose name, telephone number, and address were in Defendants' file.

96. The CHP 180 certified that the reporting party had no other information.

97. That certification was false. Defendants possessed GPS location data, voicemail records, and internal communications identifying Plaintiff as a good customer.

98. Cruz knew each certification was false when he signed.

99. Defendants' system offers five classifications for a missing vehicle, including a classification for a vehicle overdue from a valid renter. Defendants classified the Altima as STOLEN LOT, the classification for a vehicle taken from the lot by an unknown person, and left the customer name, customer address, credit identification, and driver's license fields of the record blank, while every one of those fields was populated in the reservation and account records for the same vehicle.

100. Cruz caused the CHP 180 to be transmitted to the San Francisco Police Department.

101. On or about October 25, 2022, Defendants caused the Altima, California license plate 8ZXZ692, to be entered as stolen into the California Stolen Vehicle System and the National Crime Information Center.

102. The California Stolen Vehicle System and the National Crime Information Center are databases maintained by the California Department of Justice and the Federal Bureau of Investigation and accessed by law enforcement agencies in every state.

103. An entry in those databases causes any law enforcement officer in the United States who queries the vehicle to receive a stolen vehicle hit and to treat the driver as a felony suspect.

**F. The Arrest of October 26, 2022**

104. On October 26, 2022, two days before her scheduled flight home, Plaintiff returned to the Altima, parked outside a restaurant in Dublin, California.

105. Dublin Police Department officers Rahim Middlebrook, William Watson, and Eric Chaloner were waiting at the vehicle in response to an automated alert generated by the Stolen Vehicle System entry.

106. The officers announced over a loudspeaker that the vehicle had been reported stolen and ordered Plaintiff to raise her hands and back away from it.

107. Plaintiff complied with every instruction.

108. Two officers pointed firearms at Plaintiff's head as she backed toward them.

109. Plaintiff was handcuffed.

110. Plaintiff told the officers the vehicle was rented, that she was a travel nurse manager at Kaiser, that her employer had rented it for her, and that the paperwork was in the car.

111. Plaintiff was placed in the rear of a patrol vehicle in public view while officers searched the Altima.

112. Four additional Dublin officers arrived.

113. The stop and search lasted at least an hour.

114. An officer told Plaintiff that the paperwork in the vehicle did not match the vehicle. Plaintiff told him it was what Defendants had given her on June 26, 2022.

115. The officers telephoned Defendants from the scene to verify the status of the vehicle and spoke with Defendant Cruz.

116. Cruz stated to the officers that no one was listed as the driver or responsible party for the vehicle and that Defendants' system contained no information on the driver.

117. Cruz told the officers that Plaintiff had no business with the car and instructed them to arrest her.

118. Officer Middlebrook has since testified under oath that Defendants' report and Defendants' demand that Plaintiff be prosecuted constituted fifty to seventy percent of his decision to arrest, and that no documentation in Plaintiff's possession could have overcome Defendants' report once it was in the law enforcement database.

119. Plaintiff was arrested on a felony charge of unlawful taking of a vehicle under California Vehicle Code section 10851.

**G. Santa Rita Jail**

120. Plaintiff was transported to Santa Rita Jail in Dublin, Alameda County, and booked.

121. Plaintiff was confined in a cell approximately five feet by eight feet.

122. The walls of the cell were smeared with human feces.

123. The metal toilet in the cell bore a ring of hardened feces approximately three inches thick protruding from the bowl.

124. The floor and benches of the cell were covered in used toilet paper several inches deep.

125. Plaintiff was held in that cell with as many as five or six other detainees.

126. Among them were two detainees in active opioid withdrawal, one of whom suffered a psychotic episode in the cell, screamed, and struck her head against the wall until she was removed.

127. Among them was a detainee held on suspicion of murder.

128. Plaintiff was physically assaulted by another detainee in the cell.

129. Plaintiff remained in custody overnight.

130. Plaintiff is a trauma nurse whose professional discipline is infection control and pathogen exposure. She understood exactly what she was confined in.

## H. Release, Dismissal, and the Findings of Factual Innocence

131. On October 27, 2022, Plaintiff was released on a signature bond.

132. As a condition of release, jail personnel required Plaintiff to provide a DNA sample, and told her that refusal would result in continued detention until she could be brought before a judge.

133. Plaintiff's DNA profile was entered into the California offender database.

134. On October 28, 2022, Plaintiff appeared at the Alameda County Courthouse in Dublin. The District Attorney reviewed Plaintiff's rental documentation and declined to file any charge.

135. The disposition recorded by the Dublin Police Department is No Charges Filed.

136. On October 27, 2022, within hours of her release, Plaintiff telephoned her account representative at the staffing agency, Leslie Hertz, left a voicemail stating that she had been jailed because of the agency's rental vehicle and that someone needed to call her back, and received no response for more than twenty-four hours.

137. Plaintiff called again and stated that she would sue. Only then did Ben Harber, an executive of the staffing agency, return her call.

138. The staffing agency gave Defendants notice of the arrest. Defendants' head of legal, Jim Brown, later acknowledged to Plaintiff that Defendants had received that notice from the agency.

139. On November 2, 2022, in response to the staffing agency's inquiry, Defendants transmitted to the agency a system print of Plaintiff's rental agreement bearing the statement NO VEHICLE EXCHANGES EXIST FOR THIS CONTRACT. The statement was false. Defendants' own manager had selected the Altima for Plaintiff and

Defendants' own gate agent had released it to her on June 26, 2022. The print was produced in the related action at AVIA001766.

140. In the days following her release, Plaintiff spoke with Defendants' customer service. Defendants confirmed that the last entry in their system concerning Plaintiff was the return of the Camry on June 26, 2022, and that their records showed no exchange for the Altima.

141. Defendants' loss prevention record for the vehicle, produced in the related action as AVIA001809, records a title verification by the Virginia Beach title section and the entry "Last Renter Contacted Y" against a telephone number that is not Plaintiff's. Plaintiff was never contacted by Defendants before the report.

142. On November 1, 2022, Defendant Parker signed and caused to be sent by United States mail a letter to the San Mateo County Sheriff directing that all police alarms on the vehicle be cancelled, and on or about the same date contacted the National Insurance Crime Bureau concerning the vehicle's recovery status.

143. Defendants' Rule 30(b)(6) designee in the related action testified under oath that Defendants maintain a standing report of every vehicle not inventoried within thirty days, a database of loss prevention cases, a vehicle history for every unit retrievable by asset number for the life of the vehicle, tracking of every arrest in a Defendant vehicle, and annual stolen vehicle statistics. Defendants have declined to produce those records in the related action.

144. In January 2023, Plaintiff petitioned the Dublin Police Department under Penal Code section 851.8 for a finding of factual innocence. Plaintiff paid approximately $4,000 in legal fees for that petition.

145. On February 10, 2023, Garrett Holmes, Chief of Police for the City of Dublin, granted the petition and certified that no reasonable cause existed to believe Plaintiff had committed the offense.

146. Because the petition had been submitted with an incorrect date of birth, the resulting determination did not clear Plaintiff's record. Plaintiff resubmitted the petition with the correct date of birth.

147. On June 12, 2023, Nate Schmidt, Chief of Police for the City of Dublin, granted the resubmitted petition and certified the same finding.

**I. The Record That Did Not Clear and the Loss of Plaintiff's Practice**

148. Notwithstanding both determinations, the felony theft arrest remains in Plaintiff's criminal history as reported to employers and credentialing bodies.

149. The arrest appears in background checks conducted by staffing agencies and hospital clients in connection with interim nurse executive engagements.

150. Before October 26, 2022, Plaintiff had her choice of interim engagements in any region of the country.

151. After October 26, 2022, Plaintiff was no longer eligible for those engagements, because she could not pass the background check they require.

152. Plaintiff returned to work at Kaiser Permanente in January 2023.

153. Plaintiff returned to her per diem nursing position at Alameda Health System in April 2023.

154. Plaintiff continued working in those positions until her treating providers determined she could no longer safely practice, at which point she went on disability leave.

155. Plaintiff has been on disability leave for approximately eighteen months as of the filing of this complaint.

156. Plaintiff conservatively estimates her lost income from October 26, 2022 through mid-2026 at more than $1,100,000.

**J. Other Lawful Renters, 2014 to 2025**

157. The acts alleged above were not isolated. Each of the following incidents involved a vehicle lawfully in a customer's possession under documentation Defendants issued; a record in Defendants' system that did not reflect that possession because Defendants failed to record a return, an extension, a re-rental, or a recovery; a theft report transmitted to law enforcement without verification; and the armed stop, detention, or arrest of the customer. Plaintiff pleads each on the basis of public reports and public court filings.

158. Philadelphia, Pennsylvania, 2014. Stephen Rollins, a corrections officer and Marine Corps reservist, rented from Budget at Philadelphia International Airport, extended by telephone, and paid each extension by credit card. Defendants processed the payments, failed to update the local return log, and reported the vehicle stolen. Rollins was arrested for felony auto theft and suspended from his employment.

159. Dallas and Fort Worth, Texas, 2014 to 2015. A physician holding a corporate account that permitted telephone renewals extended by telephone. Defendants failed to update their system and filed a felony theft report with airport police. The physician was arrested in 2014 and twice more during routine traffic stops because the warrants were never purged, before all charges were dismissed in 2015.

160. Fort Pierce, Florida, 2019. Defendants' Budget brand rented a Toyota Tacoma on a driver's license its customer had reported lost. Defendants' own system recorded the truck checked in at the rental location on its due date. Defendants' manager nonetheless executed a sworn stolen vehicle affidavit, a felony warrant issued, and the customer was arrested and posted bond. The State entered a nolle prosequi on January 11, 2021.

161. Houston, Texas, and Tempe, Arizona, 2020 to 2021. A customer returned a Budget truck to a garage adjacent to Defendants' Houston Hobby Airport office and mailed the key. Defendants recovered the truck and charged her card for the rental, cleaning, and parking then told the Houston Police Department the truck had never been returned. She was charged with felony theft, arrested in Tempe, Arizona, and held for sixty-four days. The State moved to dismiss on the ground that no probable cause existed and the charge had been filed after the truck was returned.

162. Wilmington, North Carolina, 2021. A customer renting under a corporate account with telephone rollovers was reported stolen by Defendants, entered into the National Crime Information Center, and arrested at the gate of Camp Lejeune in front of her two minor children. The criminal charge was dismissed.

163. Houston, Texas, November 2022. A rental Tesla became disabled on Interstate 10 in Louisiana. A Louisiana State Police trooper attended the vehicle, ran its plate, and transported the customers to safety. The customers hand-delivered the keys to Defendants' counter the same day. Three weeks later Defendants' loss prevention department mailed a demand letter invoking Texas Penal Code section 31.04 and threatening a stolen vehicle listing and a warrant, and Defendants charged the customer's card.

164. Johnson City, New York, 2018 to 2019. A customer reserved and paid for a Honda CR-V through Zipcar, Inc., a wholly owned subsidiary of Avis Budget Group, Inc. Zipcar's inventory system did not reflect the reservation, Zipcar's asset protection function reported the vehicle stolen, and a Johnson City police officer acting on that report conducted a felony stop and arrested the customer at gunpoint. The customer sued in April 2019. On March 25, 2021, the court denied the officer's motion to dismiss the false arrest claim. The action was later dismissed without prejudice for failure to prosecute on April 19, 2022, while Defendants' report of Plaintiff's vehicle was six months away.

165. Oceanside, California, January 2023. Defendants' Payless brand reported a minivan stolen on January 4, 2023. The vehicle was returned days later. Defendants never notified police to cancel the report and re-rented the vehicle on January 29, 2023 to a Wisconsin couple. Oceanside police conducted a felony stop at gunpoint and handcuffed them. Trial in San Diego County Superior Court commenced October 7, 2025. Defendants settled for $350,000 immediately after opening statements. Defendants stated publicly that their protocols had failed in an isolated incident.

166. Torrance, California, March 22, 2023. Defendants rented a Nissan Altima to Ramona Gutierrez, a rideshare driver, while the vehicle remained listed as stolen from a prior report that Defendants had not cleared after recovery. Los Angeles County Sheriff's deputies stopped her on the 210 Freeway with approximately six units, drew firearms, and handcuffed her, injuring her wrists. Defendants settled her claim.

167. September 2023. Defendants re-rented a vehicle that a prior renter had reported stolen and then returned, without clearing the report. Police seized the vehicle from the new customer. Defendants stated publicly that they only report to authorities as a last resort

and have comprehensive safeguards in place to prevent erroneous or premature theft notifications.

168. Canton, Georgia, July to October 2023. A customer returned a Ford Edge to Defendants' Canton location, placing the keys in the center console at the instruction of Defendants' employee. Defendants never recorded the return. The vehicle was later recovered in San Antonio, Texas. Defendants treated the customer as having retained the vehicle for fifty-seven days, sent a demand letter treating it as stolen, and charged his card more than $4,100.

169. Chino Hills, California, November 2023. A customer who had rented from Defendants' Budget brand for months with regular extensions was stopped minutes from the return location and arrested for stealing the vehicle.

170. Carrollton, Georgia, May 2024. A customer who rented from Defendants at Hartsfield-Jackson Atlanta International Airport was stopped at gunpoint and arrested after an automated license plate reader identified the vehicle as stolen.

171. Franklin County, Ohio. A customer was accused by Defendants of stealing a vehicle he had never rented and was imprisoned for thirty-seven days. He sued. Defendants resolved the matter by stipulated dismissal with prejudice on July 20, 2026, eleven days after the District Court in the related action ordered Defendants to produce their records of other false theft reports.

172. Anne Arundel County, Maryland. Two customers who rented from Defendants at Baltimore-Washington International Airport were stopped at gunpoint in Pennsylvania, handcuffed, separated, and interrogated roadside because Defendants had not cleared a

prior theft report after recovering the vehicle. Their counsel has stated publicly that he has represented at least ten individuals in comparable matters.

173. Geauga County, Ohio, June 2025. A customer who rented from Defendants in Manhattan under a corporate discount account was stopped on an Ohio highway by deputies with weapons drawn after the plate returned as stolen. The entry Defendants had caused was never fully cleared from the national database.

174. Norfolk, Virginia, August 29, 2025. Defendants rented a Mazda 3 to a Navy trainee and his family. The vehicle had previously been reported stolen, returned to Defendants, and re-rented without the report being cleared. Police surrounded the family's car, pointed firearms at the parents and their eleven-year-old and eight-year-old children, and handcuffed both parents. The family sued Avis Budget Group, Inc. in the District of New Jersey on August 20, 2026.

**K. Defendants' Public Statements and Their Own Records**

175. Defendants have characterized each of the foregoing incidents, when asked, as isolated.

176. Defendants' designated corporate witness in the related action has acknowledged under oath that the universe of incidents in which Defendants incorrectly marked a vehicle as stolen with police involvement is national in scope and spans at least six years.

177. Defendants have been ordered by this Court in the related action to produce the documents listing the number of such reports. As of the filing of this complaint, Defendants have produced none.

178. In each incident file Defendants have produced, from Texas, California, North Carolina, Florida, and Ohio, Defendants' loss prevention demand letter contains the identical

paragraph: the demand takes precedence over and supersedes any and all oral representations, including extensions or modifications of the agreement by phone. The letter then threatens criminal prosecution under the applicable state statute.

179. In California, Defendants' demand letter invokes Vehicle Code section 10855 and its five-day presumption.

180. The same address, 300 Centre Pointe Drive, Virginia Beach, appears in Defendants' incident files as the loss prevention department, the corporate security office, the service of process contact, and the notarization location for the sworn coverage disclosures of Defendants' claims administrator.

181. Defendants' incident files for the other incidents alleged above show that Defendants' recovery contractor, Asset Retrieval and Investigations, records in Defendants' systems when a customer has been arrested, and in at least one incident advised Defendants before the police report was made that the matter appeared to be fraud.

182. Sedgwick Claims Management Services, Inc. administers as insurance claims the incidents in which Defendants' theft reports result in the arrest of a lawful renter, including claims for false arrest.

## RICO ALLEGATIONS

### A. The Enterprise

183. The Avis Budget corporate family, consisting of Avis Budget Group, Inc., Avis Budget Car Rental, LLC, PV Holding Corp., and the other subsidiaries through which Avis Budget Group, Inc. operates the Avis, Budget, Payless, and Zipcar brands, is a single organization. Plaintiff does not allege that any member of that family is an enterprise

whose affairs are conducted by another member of that family. In each enterprise alleged below, the organization is either one member of a larger association that includes entities Defendants do not own or control, or it is itself the enterprise whose affairs the individual Defendants conducted.

184. The Vehicle Recovery Enterprise. The Vehicle Recovery Enterprise is an association in fact within the meaning of 18 U.S.C. § 1961(4). Its members are the Avis Budget corporate family; Sedgwick Claims Management Services, Inc., the independent claims administrator to which Defendants refer every incident in which a theft report results in the detention or arrest of a renter; Asset Retrieval and Investigations and the other independent recovery and repossession contractors Defendants engage to locate and retrieve vehicles and to report their recovery and the arrest of their drivers into Defendants' systems; and the individual Defendants and Doe Defendants.

185. The Vehicle Recovery Enterprise is distinct from each Defendant and from the Avis Budget corporate family. Sedgwick Claims Management Services, Inc. and the recovery contractors are companies Defendants do not own or control, with their own businesses, employees, and revenues, that participate in the recovery and disposition of every vehicle and every renter the Enterprise targets. Living Designs, Inc. v. E.I. DuPont de Nemours & Co., 431 F.3d 353, 361-362 (9th Cir. 2005); Odom v. Microsoft Corp., 486 F.3d 541, 548-553 (9th Cir. 2007) (en banc); Sever v. Alaska Pulp Corp., 978 F.2d 1529, 1534 (9th Cir. 1992).

186. The Vehicle Recovery Enterprise has a common purpose: to recover vehicles that Defendants' records show as unaccounted for, and to collect money from the renters associated with those vehicles, by reporting the vehicles stolen to law enforcement

without verification, by transmitting demand letters threatening prosecution, and by disposing of the resulting detentions and arrests as insurance claims. That purpose is distinct from the business of renting vehicles. It begins where the rental record fails.

187. The members of the Vehicle Recovery Enterprise have relationships that serve that purpose, alleged in paragraphs 180 through 182: a single loss prevention department at Virginia Beach that places and clears police alarms for every brand; a single form of demand letter used in every state; recovery contractors that write into Defendants' systems; and a single claims administrator that receives every resulting arrest.

188. The Vehicle Recovery Enterprise has operated continuously since at least 2009 and continues to operate. It is engaged in, and its activities affect, interstate commerce: it places vehicles into a national law enforcement database, mails demand letters to renters in every state, and recovers vehicles across state lines.

189. Every predicate act alleged in Part C, including each of the incidents alleged in paragraphs 157 through 174, was committed in the conduct of the Vehicle Recovery Enterprise's affairs: each was a theft report, database entry, demand letter, or recovery communication made by the Virginia Beach loss prevention department or at its direction, serviced by the recovery contractors, and closed through Sedgwick.

190. The Corporate Account Enterprise. In the alternative, the Corporate Account Enterprise is an association in fact within the meaning of section 1961(4). Its members are the Avis Budget corporate family; the corporate account holders whose employees drive vehicles under accounts the account holder pays, including AMN Healthcare Interim Solutions, LLC, formerly B.E. Smith Interim Solutions, LLC, and its parent AMN Healthcare, Inc.; the travel management companies through which those rentals are reserved and billed,

including Acendas Travel, a Kansas corporation believed to be organized as All About Travel, Inc., affiliated with BCD Travel of the Netherlands; Sedgwick Claims Management Services, Inc.; and the individual Defendants and Doe Defendants.

191. AMN Healthcare Interim Solutions, LLC, AMN Healthcare, Inc., Acendas Travel, Sedgwick Claims Management Services, Inc., and the recovery contractors are not Defendants. They are members of the enterprises alleged. A member of an enterprise need not be a defendant, need not be liable, and need not share the defendants' purpose. Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161-166 (2001).

192. The Corporate Account Enterprise is distinct from the Avis Budget corporate family because it includes the account holders and travel managers, companies Defendants do not own or control, whose accounts are billed, whose reservations are carried on the rental paper, and whose employees are the drivers Defendants report. Its purpose is to supply, bill, track, exchange, and recover vehicles under accounts in which a third party pays, the driver holds no contract in her own name, and the rental is continuous and renewed by exchange or telephone rather than by return. The relationships that serve that purpose are alleged in paragraphs 44 through 63.

193. The predicate acts committed in the conduct of the Corporate Account Enterprise's affairs are those alleged in Predicate Acts 1 through 9A and the corporate account incidents alleged in paragraphs 159, 162, and 173: the physician's corporate account with telephone renewals in 2014 and 2015, the Wilmington corporate account with telephone rollovers in 2021, and the Manhattan corporate discount rental in 2025. In each, the account holder paid, the driver held no contract in her own name, Defendants' system did not record the renewal or exchange, and Defendants reported the vehicle stolen.

194. The corporate enterprise. In the further alternative, Avis Budget Group, Inc., together with the subsidiaries through which it operates, is a single corporation and is an enterprise within the meaning of section 1961(4), engaged in and affecting interstate commerce. Cruz, Russell, Reid, DeCorte, Brooks, Laylo, Catam, Parker, and the Doe Defendants are natural persons distinct from that enterprise who conducted its affairs through the pattern alleged below. A corporate officer or employee who conducts the corporation's affairs through a pattern of racketeering activity is a person distinct from the corporate enterprise. Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163-166 (2001). Under this alternative no member of the Avis Budget corporate family is alleged to be a person liable under section 1962(c), and the liability of the corporate Defendants rests on the Vehicle Recovery Enterprise and the Corporate Account Enterprise alleged above.

195. Each Defendant participated in the operation or management of each enterprise alleged. Avis Budget Group, Inc. designed and maintained the policies, the incentive structures, and the loss prevention department. Avis Budget Car Rental, LLC operated the rental locations, held the corporate accounts, and employed the personnel who executed the predicate acts. PV Holding Corp. was the registered owner in whose name each theft report was sworn and each database entry was made. Russell directed reporting decisions within his region. Cruz executed the reports. Laylo originated the account and then misdescribed the records on which the reporting decision depended. Catam terminated the mini-lease transaction and directed Plaintiff to the counter without disclosing the termination. Reid supervised Russell and received the theft record two months before the report was made. DeCorte and Brooks participated in the decision to report and did not

direct verification. Parker and Does 1 through 12 processed, approved, and closed the report at Virginia Beach, recorded a last-renter contact that did not occur, and mailed the recovery correspondence. Reves v. Ernst & Young, 507 U.S. 170, 179 (1993).

196. The individual Defendants used the corporate Defendants as a vehicle to advance their own interests, and not necessarily or primarily the interests of the corporations. Counter personnel generate bad paper because the practices described in paragraphs 51 through 56 produce commissions, upgrade credits, and performance metrics for the employee who writes the paper. Station and regional managers convert bad paper into theft reports because an open contract on the station's books is a metric charged against the manager, and a theft report clears it. Russell's statement that he did not want another good customer pulled out on bad paper, alleged in paragraph 88, shows that he knew the paper was bad, knew the customer was a paying customer, and reported anyway. Laylo misdescribed the account she had originated in order to distance herself from the paper written against it. Each of them acted to protect compensation, metrics, and standing rather than to serve any legitimate interest of the corporations.

197. Avis Budget Group, Inc.'s Short-Term Incentive Plan applies to Avis Budget Group, Inc. and its subsidiaries, and conditions incentive income on financial gates measured at the corporate and area level. The plan provides that if the company learns of intentional misconduct by an employee that increased that employee's incentive income, the company will require reimbursement. Defendants have stated in the related action that no document concerning reimbursement, reduction, or forfeiture of incentive income in connection with the June 26, 2022 transaction or the October 25, 2022 report has ever existed. Cruz and Russell remained in their positions through 2026. The absence of any

consequence for a false sworn report that caused the arrest of a paying customer is the corporation's ratification of the conduct and the reason the conduct recurs.

**B. The Scheme to Defraud**

198. From at least 2009 through the present, Defendants devised and carried out a scheme to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

199. The scheme has three components. First, Defendants' employees generate bad paper through the practices described in paragraphs 51 through 56. Second, Defendants' loss prevention function converts bad paper into theft reports to law enforcement without verifying the record against the customer's documentation or Defendants' own contact records. Third, Defendants transmit demand letters by mail threatening criminal prosecution and charge customers for the period the record shows the vehicle outstanding.

200. The objects of the scheme are rental payments obtained by issuing documentation Defendants' systems do not honor; vehicles recovered and fees collected by causing law enforcement to act on reports Defendants have not verified; and payments extracted by demand letters asserting a breach that Defendants' own records, properly read, would refute.

201. The theft reports and demand letters transmitted in furtherance of the scheme were knowingly false or were made with reckless disregard for their truth. Defendants held the customer's name, telephone number, email address, employer, corporate account, and payment card for every vehicle they reported, and held the location of the vehicle itself

through its telematics. A report that a vehicle in the documented possession of a paying customer has been stolen, made by the party that holds that documentation and has not read it, is not an honest mistake and is not a good-faith request for law enforcement assistance.

202. The scheme depends on concealment from customers, from law enforcement, and from the public, including through Defendants' statements that incidents are isolated and that comprehensive safeguards exist.

203. Law enforcement is the instrumentality of the scheme. A stolen vehicle entry in the National Crime Information Center causes any officer who runs the plate to conduct a felony stop and take the driver into custody. Defendants obtain, at no cost, a nationwide armed vehicle recovery service. The customer bears the cost.

## C. The Predicate Acts

204. Each of the following constitutes mail fraud in violation of 18 U.S.C. § 1341 or wire fraud in violation of 18 U.S.C. § 1343, or both, and is racketeering activity within the meaning of 18 U.S.C. § 1961(1). Plaintiff pleads each with the particularity required by Rule 9(b).

205. Predicate Act 1. On June 26, 2022, between 20:49 and 21:53, Defendants' agent terminated the mini-lease transaction and issued rental agreement 756086236, as alleged in paragraphs 66 through 78. The agreement was false. It was issued to induce Plaintiff to accept the Altima, to pay for its use, and to rely on it as proof of lawful possession, while Defendants' system recorded no rental to her. The transmission was by wire in interstate commerce.

206. Predicate Act 2. On or about August 2, 2022, Laylo stated that the account was not a mini-lease, as alleged in paragraph 86. The statement was false, was transmitted by wire through Defendants' internal systems, and was made to conceal the corporate account under which Plaintiff held the Altima.

207. Predicate Act 3. On or about August 21, 2022, Defendants' employees transmitted the bad paper message alleged in paragraph 88, by wire in interstate commerce, identifying the Altima as a bad paper matter and proceeding to treat it as a theft.

208. Predicate Act 4. On or about October 11, 2022, Russell transmitted the message alleged in paragraph 89, by wire in interstate commerce, acknowledging that the person in possession was a customer and that the cause was Defendants' own documentation, and nonetheless proceeding within fourteen days to direct the report.

209. Predicate Act 5. On or about October 25, 2022, Russell transmitted to Cruz, DeCorte, and Brooks the instruction alleged in paragraph 90, by wire in interstate commerce, directing the execution of Predicate Acts 6 and 7.

210. Predicate Act 6. On October 25, 2022, Cruz executed and caused to be transmitted to the San Francisco Police Department the CHP 180 alleged in paragraphs 91 through 101, containing three certifications each of which was false and known by Cruz to be false, for the purpose of obtaining recovery of the Altima through law enforcement on a false representation that it had been stolen.

211. Predicate Act 7. On or about October 25, 2022, Defendants caused the Altima to be entered as stolen into the California Stolen Vehicle System and the National Crime Information Center, as alleged in paragraph 101, by wire in interstate commerce. The entry was false.

212. Predicate Act 8. On October 26, 2022, Cruz stated by telephone to the Dublin officers that no one was authorized to drive the Altima and instructed them to arrest Plaintiff, as alleged in paragraph 115, by wire in interstate commerce. The statement was false and was made to complete the recovery through law enforcement and to foreclose inquiry into Plaintiff's documentation.

213. Predicate Act 9. On November 1, 2022, Defendant Parker caused to be sent by United States mail to the San Mateo County Sheriff a letter concerning the recovery of a vehicle that Defendants had reported stolen while it was in the documented possession of their own customer, in furtherance of the scheme and of the concealment alleged in paragraph 141, in violation of 18 U.S.C. § 1341.

214. Predicate Act 9A. On November 2, 2022, Defendants transmitted by wire to the staffing agency, the account holder and a member of the Corporate Account Enterprise, the statement alleged in paragraph 139 that no vehicle exchange existed for Plaintiff's contract. The statement was false, was made after Defendants had notice of the arrest, and was made to conceal from the account holder that Defendants' own employees had released the Altima to Plaintiff, in violation of 18 U.S.C. § 1343.

215. Predicate Acts 10 and following. Each theft report, database entry, and demand letter transmitted in the incidents alleged in paragraphs 157 through 174 constitutes a further predicate act of mail or wire fraud, executed by the same means and for the same purpose. Plaintiff will identify each with particularity upon production of Defendants' incident files, which this Court has ordered in the related action.

**D. Relatedness and Continuity**

216. The predicate acts are related within the meaning of H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239-240 (1989). Each was a false statement that a vehicle in the lawful possession of Defendants' own renter had been stolen, or a demand or recovery communication built on that statement; each was made by or at the direction of the same loss prevention department using the same forms, the same databases, and the same demand letter; each had the same purpose, recovery and collection through law enforcement at no cost to Defendants; each had the same result, the armed stop, detention, or arrest of a paying renter, or a demand for payment on a vehicle already returned; and each had the same class of victims, Defendants' own customers.

217. The predicate acts satisfy closed-ended continuity. In the conduct of the Vehicle Recovery Enterprise and of the corporate enterprise they extend from at least 2014 through August 2025, a period exceeding eleven years, across ten states and four brands, with at least eighteen separate incidents. In the conduct of the Corporate Account Enterprise they extend from 2014 through 2025, with at least four separate incidents involving four separate account holders.

218. The predicate acts satisfy open-ended continuity. They are Defendants' regular way of conducting business. Defendants have never corrected the practices identified in 2009, have never implemented the verification their own procedures and public statements describe, maintain the arrest tracking and annual theft statistics alleged in paragraph 143 as an ordinary business record, imposed no consequence on any employee for Plaintiff's report as alleged in paragraph 197, and continued to report vehicles stolen without verification after Plaintiff's arrest and through at least August 2025.

219. Plaintiff need not have been injured by each predicate act. Plaintiff was injured by the violation, which is the conduct of the enterprise through the pattern, and the predicate acts that injured her are Predicate Acts 1 through 9A. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 495-497 (1985).

**E. Injury to Business and Property**

220. Plaintiff has suffered two distinct injuries by reason of Defendants' predicate acts.

221. The first is the personal injury of false imprisonment and its physical and psychological consequences, alleged in paragraphs 120 through 132. Plaintiff does not seek recovery for that injury in this action. It is the subject of the related action.

222. The second is injury to Plaintiff's business and property within the meaning of 18 U.S.C. § 1964(c), for which Plaintiff seeks recovery here.

223. At the time of Defendants' predicate acts, Plaintiff held legally protected interests under California law in her existing and prospective business and employment relations: her engagement through AMN Healthcare Interim Solutions, LLC placing her at Kaiser Permanente; her per diem employment with Alameda Health System; her professional licenses and credentials; and her prospective engagements as an interim nurse executive, a practice she had built over approximately thirty years.

224. California law protects each of those interests through the torts of intentional interference with contractual relations and intentional interference with prospective economic advantage. Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376 (1995).

225. Each of those interests is property within the meaning of section 1964(c). Diaz v. Gates, 420 F.3d 897 (9th Cir. 2005) (en banc); Mendoza v. Zirkle Fruit Co., 301 F.3d 1163 (9th Cir. 2002).

226. Defendants' predicate acts injured those interests directly. The CHP 180 and the database entry caused the arrest. The arrest placed a felony theft charge in Plaintiff's record. The record rendered Plaintiff unable to perform her existing engagements and unable to obtain prospective ones, as alleged in paragraphs 148 through 156.

227. The injury is direct. Plaintiff is the person whose vehicle Defendants reported stolen, the person Defendants instructed the officers to arrest, and the person whose employment relations were destroyed. There is no intervening victim and no pass-through. Medical Marijuana, Inc. v. Horn, 604 U.S. ___ (2025).

228. Plaintiff mitigated, as alleged in paragraphs 152 and following.

229. In the alternative, to the extent Plaintiff's contracting practice constituted a business within the meaning of section 1964(c) as a sole proprietorship or through any entity, Defendants' predicate acts injured that business by destroying its capacity to obtain engagements.

## STATEMENT OF CLAIMS

## FIRST CLAIM FOR RELIEF

### Civil RICO: Conduct of an Enterprise Through a Pattern of Racketeering Activity

### 18 U.S.C. § 1962(c)

### (Against All Defendants)

230. Plaintiff realleges and incorporates by reference each preceding paragraph.

231. Each Defendant is a person within the meaning of 18 U.S.C. § 1961(3).

232. The Vehicle Recovery Enterprise, and in the alternative the Corporate Account Enterprise, is an enterprise within the meaning of 18 U.S.C. § 1961(4), engaged in and affecting interstate commerce, and each Defendant is a person distinct from it. In the further alternative, Avis Budget Group, Inc. and its subsidiaries are a single corporate enterprise and the individual Defendants are persons distinct from it.

233. Each Defendant conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity consisting of the predicate acts alleged above, in violation of 18 U.S.C. § 1962(c).

234. Plaintiff was injured in her business and property by reason of that violation.

235. Under 18 U.S.C. § 1964(c), Plaintiff is entitled to threefold the damages she has sustained, the costs of this action, and reasonable attorney's fees.

## SECOND CLAIM FOR RELIEF

## Civil RICO Conspiracy

## 18 U.S.C. § 1962(d)

## (Against All Defendants)

236. Plaintiff realleges and incorporates by reference each preceding paragraph.

237. Each Defendant knowingly agreed to facilitate the scheme and agreed that at least two predicate acts would be committed in furtherance of it, in violation of 18 U.S.C. § 1962(d).

238. Avis Budget Group, Inc. agreed by promulgating and maintaining the policies, incentive structures, and loss prevention function that constitute the scheme.

239. Avis Budget Car Rental, LLC agreed by operating the locations and employing the personnel who executed the predicate acts.

240. PV Holding Corp. agreed by lending its name as registered owner to each theft report.

241. Russell agreed by directing Cruz to report the Altima stolen with knowledge that Plaintiff was a good customer and that the record was bad paper.

242. Cruz agreed by executing the CHP 180 with knowledge that each certification was false.

243. Laylo agreed by misdescribing the account under which the Altima had been released.

244. Catam agreed by terminating the mini-lease transaction and directing Plaintiff to the counter without disclosing that he had done so.

245. Reid agreed by supervising the reporting decision with knowledge of the August 21, 2022 record and without directing verification.

246. DeCorte and Brooks agreed by participating in the October 25, 2022 chain directing the report without directing verification.

247. Parker agreed by processing, approving, and closing the report at Virginia Beach and by mailing the recovery correspondence.

248. The Doe Defendants agreed by directing, approving, transmitting, or processing the reports and demand letters that constitute the pattern.

249. Plaintiff was injured in her business and property by reason of the conspiracy, through the overt predicate acts alleged above.

250. Under 18 U.S.C. § 1964(c), Plaintiff is entitled to threefold the damages she has sustained, the costs of this action, and reasonable attorney's fees.

## THIRD CLAIM FOR RELIEF

## Unfair Competition Law

## California Business and Professions Code § 17200 et seq.

## (Against Avis Budget Group, Inc., Avis Budget Car Rental, LLC, and PV Holding Corp.)

251. Plaintiff realleges and incorporates by reference each preceding paragraph.

252. Defendants' practice of reporting vehicles stolen to law enforcement, and entering them into stolen vehicle databases, without first verifying whether the vehicle is in the lawful possession of a customer to whom Defendants rented it, and Defendants' practice of failing to clear such reports after a vehicle is recovered or returned, are unlawful, unfair, and fraudulent business practices within the meaning of Business and Professions Code section 17200.

253. The practices are unlawful because they violate 18 U.S.C. §§ 1341 and 1343 and California Penal Code section 148.5, which makes it a misdemeanor to report to a peace officer that a felony has been committed knowing the report to be false, and because California Civil Code section 47(b)(5) withdraws any privilege from a report to law enforcement made with knowledge of its falsity or with reckless disregard for its truth.

254. The practices are unfair because the harm to customers, armed detention, arrest, and a persisting criminal record, vastly outweighs any utility to Defendants, and because customers cannot reasonably avoid it.

255. The practices are fraudulent because Defendants' public statements that they report only as a last resort and maintain comprehensive safeguards are likely to deceive members of the public into believing that the documentation Defendants issue protects them.

256. Plaintiff has suffered injury in fact and has lost money or property as a result of the practices.

257. Plaintiff seeks, under Business and Professions Code section 17203, an injunction requiring Defendants, before reporting any rental vehicle as stolen to any law enforcement agency or entering it into any stolen vehicle database, to verify against Defendants' own rental, corporate account, telematics, and customer contact records that the vehicle is not in the lawful possession of a customer, and to attempt contact with the customer of record by each means in Defendants' file; and requiring Defendants, within twenty-four hours of recovering or receiving the return of any vehicle previously reported stolen, to cause the report to be cleared from every database into which it was entered.

258. Plaintiff seeks no monetary recovery under this claim beyond restitution of any amount Defendants obtained from her.

## DAMAGES

259. As a direct and proximate result of Defendants' predicate acts, Plaintiff has suffered injury to her business and property including, without limitation: lost income from existing and prospective engagements from October 26, 2022 to the present; the loss of future earning capacity over the remainder of her professional life; the loss of the value of her contracting practice; and the costs of attempting to clear the record Defendants' acts created, including approximately $4,000 in legal fees for the first section 851.8 petition.

260. The amount of Plaintiff's injury to business and property will be established by expert testimony at trial and is subject to trebling under 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

ORIGINAL

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. On the First and Second Claims, for damages in an amount to be proven at trial, trebled under 18 U.S.C. § 1964(c);

2. On the First and Second Claims, for the costs of suit and reasonable attorney's fees under 18 U.S.C. § 1964(c);

3. On the Third Claim, for injunctive relief as set out above and for restitution under Business and Professions Code section 17203;

4. For prejudgment and post-judgment interest as permitted by law;

5. For such other and further relief as the Court deems just and proper.

BY FAX

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all claims so triable.

Dated: October 26, 2026

Respectfully submitted,

/s/ Avia Turner-Gray
Avia Turner-Gray
Plaintiff In Pro Per

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. On the First and Second Claims, for damages in an amount to be proven at trial, trebled under 18 U.S.C. § 1964(c);

2. On the First and Second Claims, for the costs of suit and reasonable attorney's fees under 18 U.S.C. § 1964(c);

3. On the Third Claim, for injunctive relief as set out above and for restitution under Business and Professions Code section 17203;

4. For prejudgment and post-judgment interest as permitted by law;

5. For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all claims so triable.

Dated: October 26, 2026

Respectfully submitted,

/s/ Avia Turner-Gray
Avia Turner-Gray
Plaintiff In Pro Per